This is Ms. de la Cruz, right? Yes, sir. And you folks are from the University of Idaho? Yes, Your Honor. We appreciate your...anytime we can have students help us out, we appreciate it. We hope you'll enjoy the experience today. And whatever the outcome, thank you for your effort. We appreciate it. Thank you very much. I hope I enjoy it as well. I'm sorry? I hope I enjoy it as well. Indeed. Please proceed. May it please the Court, my name is Caitlin de la Cruz. I'm a student representative of Petitioner Hans Vajos-Llaque under the supervision of Jeffrey Heron. I'd like to reserve five minutes on rebuttal and I'll watch the time. Okay. Very well. This case is about an immigration judge who failed to give due process to a pro se applicant who was beaten and raped. I'm going to address three issues today. First, that Mr. Vajos-Llaque's due process rights were violated, followed by the claim that his Port Certification Particular Social Group and CAT claim were not adequately considered. Counsel, let me, just because you don't have a lot of time, let me get right to it. It seemed to me that I.J. just went out of his way to give your client every opportunity to talk about his sexual orientation and so on, other than specifically saying to him, hey, do you have an issue with sexual orientation? I don't know what more he could have done. What am I missing? Your Honor, under Gaiamon v. INS, the immigration judge has a duty to scrupulously and conscientiously probe and develop the record as to all relevant facts. And where the immigration judge fell short here is he actually never asked even one directly on-point question related to Mr. Vajos-Llaque's bisexuality. He explained the procedures. He went through. But he did say at the end, I recognize it was at the end, but he then invited, because this was a pro se hearing, he invited your client to provide more information. He said, I'm looking for some information that the discrimination against you, the persecution that you claim occurred because you were bisexual. And your client provided none during the hearing, I think it's fair to say. Didn't provide any then in response to the question. And then the I.J. says he didn't establish the PSG. But even if he did, he didn't establish a nexus. And so what are we to do with that at this point? I mean, we have lots of case law that talks about the I.J.'s duties. But we also say he's not the counsel for the pro se litigant. And he discharges those duties by asking questions and giving, asking open-ended questions and things like that. Why didn't the I.J. comply with that duty here? So if we look at, and I believe you're referring to 261 of the record, where he gives this essentially quite a long monologue of the different ways that a person could make an asylum claim. And one of them on page 10, it's on line 10 on that page, and line 10, and he says, for example, you could say that somebody harmed you because you're bisexual. And then he goes on to discuss political opinion and other things, ways that you could establish asylum claim. And then on line 22, he says, is there anything that you'd like to add about all that I just said, basically? And your client says no. And your client said no. But we know from Colemnar v. I.N.S. Because you have to ask the question after each specific line. How about bisexuality? Something about that. How about political opinion? Something about that. Or does he say, here are some examples of things that might qualify you to be in a PSG. Do you have anything to say about any of those? And your client says no. No, Your Honor. What the immigration judges are required to do, and especially Mr. Zavaios Yaque's case, where the very basis of the claim from the credible fear interview was the credible fear that Mr. Zavaios Yaque had because of being a sexual minority in the case for the claim. It was raised clearly enough that DHS felt compelled to mention it on closing, and never at any point did the immigration judge say, I don't understand how your bisexuality plays a role in this. Can you tell me more about that? And if at that point Mr. Zavaios Yaque says, oh, I have really nothing else to add, that would have remedied that duty to develop the record because the immigration judge had scrupulously and conscientiously probed. But we're asking for one direct question. With respect, IJs have a tough job, as you know, a really tough job. I've read lots of records of these things, and I'm really at a loss to see what he could have done specifically other than to basically write out or state for your client what he's claiming. Our case law says that the IJs are not sherpas. They don't have to search out every possible claim. It seems to me that's what we've got here. He really gave your client every opportunity to do it. And at the end of the day, it is your client's burden of proof to show what his claim is. And I don't see how he did it here. What am I missing? In Hussein v. Rossin, which is the case that you cannot be a sherpa, the point that came out of that case is that the immigration judge cannot prevent the introduction of significant testimony. And our contention is that by not asking even one direct question about the bisexuality, that was preventing the potentially significant testimony establishing a nexus. And now, even if you do that. Scalia. But there was a direct question, and you're claiming that that direct question wasn't sufficient because it was part of a series of questions. Well, out of Kalemnar v. INS, simply asking if there's anything else you would like to add on that is not remedying a failure in the duty to develop the record. And so that's our contention, is that by making a long monologue and saying anything else that you would like to add, that did not remedy the failure. Well, but it was actually a little bit more. I want to get to the port group in a second. But as to bisexuality, he said, let's say you've established that you're bisexual and he didn't like you because of that. And he told you, I'm hurting you because you're bisexual. There's no evidence of that. Is there anything you'd like to say about that? So he really is honing in on, tell me something about why you think you were hurt because of your bisexuality. I agree, Your Honor. And if he had said it in that way and said right after, you could say that they harmed you because you're bisexual. So your objection to that is that he didn't say, tell me more about that right after. Yes, it's deeply embedded. Line 22 is saying you could have said this, then talking about another ten potential hypothetical claims you could have made and said anything else. That's not the case. So let me ask you about the port social work. Please. I just want to caution you. You're at four minutes or less now. Yeah. If you want to save any time. If you want to save, it's fine. I can ask you later. Whatever you want to do, my colleague will have questions for you whenever you want to talk. You want to save time for rebuttal or you want to use it right now? I'd like to save five for rebuttal. You don't have five anymore. Okay. I withdraw my question. I'm sorry. Just to clarify, Ms. De La Cruz, is your intent to have Mr. Kotech speak for the five-minute rebuttal? So you're not reserving any time for rebuttal. Mr. Kotech will take his five. That's correct. Okay. So we'll keep going. Okay. Thank you. This is the second time we've had this happen today. Okay. So now let me ask my question. Now let me ask my question. Okay. Go for it. Okay. And I apologize for the confusion. You now claim that Mr. Zavallos was a member of a particular social group made up of port workers. He never asserted that before the IJ, but you're saying he made enough of a contention of that in his credible fear interviews that the IJ should have asked him about it. Is that fair? Yes, Your Honor. Okay. So here's my problem. Let's assume for a moment that he is a member of that PSG. The IJ also found that any persecution that he suffered was as a result of general criminal activity. They weren't persecuting him because he was a port social worker. They were trying to get him to engage in criminal activity. And the case law seems to suggest that criminal — somebody's criminal activity against — general criminal activity against you doesn't qualify for the nexus part of the analysis. Could you address that for me? Yes, Your Honor. So that is kind of the crux of the port certification issue, is that Mr. Zavallos Yaque did thoroughly state, because of my position, I was harmed. And — Right. So let's assume that the IJ should have developed whether that was a particular social group. I have no idea whether this is — the IJ didn't do it. Assume for a moment that it is a particular social group. Doesn't his finding that the reason that you were mistreated was as a result of general criminal activity, doesn't that doom your — any claim with respect to that PSG? No, Your Honor. Criminal motives do not preclude a claim for relief, as long as a protected ground is at least one central reason. Yeah, but is there any evidence — I mean, this seems to be a common-sense conclusion here. These guys — what these guys were doing was trying to get you to smuggle drugs. They weren't persecuting you because of your membership in a group. They were engaging in criminal activity and were persecuting you because you wouldn't do it. It doesn't — why doesn't that just doom any asylum claim? Because Mr. Zavallos Yaque also testifies on page 188 of the record that they wanted him for the names of boats and container numbers. They wanted him not solely for the access that he had, but also the knowledge that he garnered as part of this port certification. We know from Plancarte Saceda v. Garland that even though they might have a criminal reason for wanting someone for basically their professional training, even though the underlying things are criminal, that if they are still pursued and they still retain that skill, that that could qualify as a particular social group. Ms. De La Cruz, I guess on that point, I'm just trying to understand with respect to that argument. Are you — you discuss a lot about this Fourth Circuit case, Quintero. Are you making a separate argument based on the regulations and I think the case you just cited that setting aside the due process, the I.J. was under a duty to Yes, Your Honor. Under Jacinto v. INS, this court recognizes that — which is Jacinto v. INS was used to create the decision in Quintero v. Garland out of the Fourth Circuit. But there's a recognition that pro se applicants aren't going to be able to say the magic words. And that's Plancarte Saceda. Sorry, no. Quintero v. Garland is the one out of the Fourth Circuit. Plancarte Saceda is Ninth Circuit. Well, even if that's the case, your client, if I understand correctly, didn't raise the port worker argument until his briefing to the BIA. Isn't that waived or forfeited? No, Your Honor, because he did raise it multiple times throughout the record. On page 256, he talks about how he was pursued because of his position. On 188, he talks about how he was pursued because of the boats and container numbers. On page 215 — But does that — does that deal with the PSG argument or the general criminal conduct that my colleague referred to? Your Honor, when the immigration judge explored Mr. Zavallos Yaque's — this kind of claim, he essentially melded the two, saying, I don't find that there's any particular social group here because this is all just generalized criminal violence. But I've seen the INS. When there's a risk of becoming a target that is appreciably different from what fellow citizens are facing, that is no longer generalized criminal violence. So that failure to recognize the particular social group to analyze it as a potential particular social group was error requiring legal remand for consideration. Other questions by my colleague? Thank you very much. Good job. All right. Let's hear from the government. Good morning, Your Honors. Good morning. May it please the Court. My name is Sherry Glazer, and I'm appearing on behalf of the United States Attorney General. Just sort of to start, Mr. Zavallos Yaque is relying quite a bit on Colin Marr, but Colin Marr was completely different. In that case, the immigration judge, what this Court held was there was a due process violation because the immigration judge had made up his or her mind about the case before the questioning began, and there's just no evidence of that here whatsoever. So that's how sort of the holding that they talk about, and I can't remember if it was the opening brief or the reply brief, that just asking an open-ended question at the end, was there anything else that you'd like to add, was not enough in that case. This case is very, very different. And here, you know, the immigration judge explained the background, explained Mr. Zavallos Yaque's rights, explained his evidentiary rights. He twice advised him to contact Esperanza Organization, an immigrant rights organization, to help him with his application, help him with translations, and he did contact the organization. The immigration judge gave him four chances to submit evidence. Right up until the day of the merits hearing, he submitted evidence. He explained that he knows his claim best. It's his duty to make sure that everything that he wants addressed, to be addressed, and Mr. Zavallos Yaque indicated that he understood. At the end of the hearing, the immigration judge said, is there anything else that you'd like to add, anything that wasn't addressed? And he declined. And then — Mr. Glaser, I wonder if — I'd like to focus on a separate part of Mr. Zavallos Yaque's claim here, and that's with respect to the port worker, something that was developed, I think, somewhat exhaustively, page after page after page was testimony about Mr. Zavallos Yaque's, you know, again, pro se. He didn't frame it exactly as a PSG, but the IJ seemed to have recognized that he was making a claim on a PSG based on his employment as a port worker. And then there are several pages of testimony. And then when we get to the end, does the IJ say anything to engage with that claim of a port worker PSG? The immigration judge does, on page 82, say that — of the decision that he did try to delineate a social group, but that there was no cognizable group here, because the case, when you look at the testimony, you look at the application, you look at his statement, everything at its core comes back to the mafia wanting to put drugs on the boats, basically, to traffic them. Okay. Is that enough under Plan Carte Saucedo that dealt with a nurse? But I think, in that case, we seem to suggest that if a petitioner is teeing up a particularized social group and there's evidence of it, there's a little more that an IJ has to do to confront that rather than saying, there's nothing here. He at least has to say, I see that you're — I mean, because the IJ doesn't acknowledge anywhere in the conclusion that that's one of the PSGs that he's trying to establish, does he? Well, I think what the IJ was really saying here, and sort of — you know, Mr. Zevallo's case really relies on Quintero, and this is where a lot of the language in Quintero — Well, that's due process, but I'm thinking about — Oh, okay. We have a number of cases that talk about, and as I understand, our Plan Carte Saucedo case is really more based on the agency's duties under its own regulations to consider the claims before it, and at least the facts, if not the magic words, of a PSG claim were before the IJ here on the Port Worker. Are you referring to the nexus part of the case, then? Well, the nexus, I think, might have some issues for the reasons that Judge Hurwitz explored, but — Focus on this other part. But I want to focus on whether the IJ — I mean, the IJ — in its conclusion acknowledge that there is a PSG claim related to his work. Yes, I agree. Okay. And why isn't that error under Plan Carte Saucedo? Well, I would agree it's not an error because when you look at the facts and circumstances that we have here, we don't have a mixed motive case at all. You know, there's no evidence — you know, this sort of bleeds a little bit into nexus, but there's no evidence that the mafia had any animus whatsoever against the petitioner in this case. All the mafia wanted, what everything comes back to, is getting these drugs on the boat. And there's also testimony — it's on page 192. There's testimony on, I believe, it's 187 to 188. And in his statement on 454, he's not the only one that the mafia targeted, that the mafia targeted lots of other people as well. Okay. So the idea is that we can get to nexus without the I.J. even discussing the PSG that the nexus would be tied to? Yes. I mean, in this case, there's no evidence the mafia even — you know, really, the PSG that they're asserting before the court is really based in the certification. And that's mentioned once in the testimony on 214 to 215. And he points out the certificate that's in the record to the immigration judge and says, you know, I want to point out the certificate to you. This proves that I have access. So they wanted me to take the drugs. I can't remember the exact language. So they wanted me to take the drugs inside, I think is what it is. So everything, you know, really, it all just comes back to this wanting the drugs on the boat. Well, let me ask — let me ask Judge Johnstone's question slightly differently to see. You agree that the I.J. did not address the purported PSG of social workers? Yes. Of port workers, I'm sorry. He did, I think, at least inferentially address a PSG of people of sexual orientation and then rejects it and finds no nexus. Is he required under these circumstances to at least address that PSG and say, I don't find — there's two separate questions. One is, do you have a PSG? And as the BIA quite correctly points out, the second one is whether there's a nexus to any alleged persecution. But I think our case law sort of says, wholly apart from due process, that when somebody makes an argument to an I.J., the I.J. should address it. And our case law also says you should try — with a pro se person, you should try to do your best to figure out what the arguments are. So I guess my question is whether or not it's reversible error. Shouldn't the I.J. in this case have addressed this social worker — this port worker PSG? I would argue no, that there's just no reversible error here. There's no case law that I'm aware of in this Court, and Quintero certainly doesn't stand for the broad proposition that's being presented, that in a case like this, that really is just based in criminal violence, and this Court has held that when a proposed social group is presented to the Court and it's based in — what it's truly centered on is general criminal violence, extortion, that sort of thing, that it doesn't meet the particularity requirement and it doesn't meet the social distinction requirement. It's hard for us to know that when it's not clear that the I.J. even recognizes that there's a PSG claim. Again, I think in Blancarte Saceda, it was a nurse, it was an occupationally-based PSG, and I don't think we said there — and, of course, the persecution was claimed from the cartels. So I think we could have said, as the I.J. said, might have said there, that, well, it's generalized social activity because the persecutors here are cartels and they're simply going after her for whatever reason. But I think we said, no, the I.J. has to recognize the PSG for purposes of determining the next step of, well, is it because of the PSG or is it because it's generalized? I'm trying to see what your best argument is that this Blancarte case is distinguishable. When those facts seem the same, right? You could have said, oh, generalized criminality there, too. Can I broaden my colleague's question? I think it encompasses it as well. Is there any case law that we have where an I.J. declined or failed to analyze a PSG that was proposed but nonetheless ruled that if there were one, there was no annexes anyway and that was upheld? Um... I can't think of any case with those specific facts, but I do know this case has held. Park v. Garland is an example of where this case talks about harmless error and where it would be futile to send a case back. And that case was very different. It talked about a particularly serious crime and whether the matter of Y.L. framework... Our analysis, if we looked at the facts, if we see them and we concluded that there was no possibility of there being a PSG, that would fall into the harmless error analysis? Is that correct? I think it would be futile to send this case back because the government argues there is no potentially cognizable PSG and there's just no nexus to anything. There's no... You know, when we look at what actually motivated the mafia, there's no evidence whatsoever that any protected characteristic motivated the mafia. The mafia wanted to get the... We're focusing on the I.J.'s opinion up till now. Let me take you to the B.I.A.'s opinion. Whether or not it was raised to the I.J., whether or not it was forfeited or waived, Petitioner in this case files a brief with the B.I.A. that says the I.J. erred by not addressing a particular social group of port workers. And there's not a mention of that anywhere in the B.I.A.'s opinion. They don't say, well, you're wrong, the I.J. didn't err in not addressing it. They just discuss generally the duties of the I.J. and say he's done a good job. Now, it may be that the I.J. shouldn't have known this argument was being made. And that's a separate issue. But why shouldn't the B.I.A. at least have addressed it? I think it's sort of nestled in there that in when they... I don't find port worker PSG nestled in there anywhere. I think just in terms of talking about the I.J. didn't clearly err in finding the fear, all it relates to is extortion and general criminal activity. And within that, that's where it's different case law, but where this Court has so long held that when that is the case and there's no mixed motive, you know, nothing, that that's the only thing that everything comes back to, that there's just no cognizable social group. Let me just cite to the B.I.A.'s opinion here. This is on, what's it, 03, well, let's see, I'm not sure exactly where it is. Anyway, it's on the second page. The B.I.A. says, the immigration judge denied the respondent's application for relief after concluding that he did not establish a valid particular social group and that any past harm or fear of future persecution would not be on account of a protected ground. Doesn't that help the government's position in terms of whether the I.J. considered whether there was a particular social group? I think it's clear the I.J. did on page 82 when the immigration judge said, you know, I've tried to delineate a social group here, but there just isn't one. And that's when the immigration judge goes into a discussion about the general criminal violence. And that is so important here, because that's all, that's just all we have, and there's no case law in this court that I can think of that requires an immigration judge, you know, to articulate some social group. Could the immigration judge have taken the evidence and said, well, you know, maybe there's Peruvian men who work at ports who have access to the boats, but when you look at all the facts and circumstances in this case, all that comes back to is this general criminal violence. So it would be a situation where when a pro se individual, you know, presents all of their evidence, that the immigration judge is then required to come up with some group that is just going to knock down. Well, the immigration, I think the immigration judge does a little more than that. Again, I'm not sure which way it cuts, but the immigration judge, I think, opens the decision by saying he's, of Ayos Yaque, is a member of a particular social group, the claim is, is that he's a member of a particular social group, this is at AR-10, a member of a particular social group, and that he operated a business with an associate named Marina Velasquez Garcia. He testified that he was killed because he refused to allow drugs to be transported in a container. So that's, I guess, again, I'm not sure which way it cuts, but it does seem like the IJ begins their analysis from a position of saying, there is some sort of occupational PSG claim here, and then all sorts of testimony and analysis of the details underline that PSG claim, but never closes the loop on it. What are we to do with that? I mean, I think the IJ does close the loop on when he says he tried to delineate a PSG, but there just wasn't one, and I think, you know, I keep repeating myself, but it's just so important that... Well, we keep asking you, too, so fair enough. ...that everything just comes back to this general criminal violence, and we have evidence, you know, testimony and whatnot that the mafia targets all these other people, too, that it's unfortunately, you know, the way it is in Peru, and, you know, the mafia targeting all these people, and this is, you know, a simple case, this is, you know, a case that's made a little more complicated by the, you know, due process arguments that are made, but this is a very simple criminal violence case, and, you know, the mafia extorting petitioner and his mother for this construction quota, and that's what everything comes back to in this case. Can I ask you a more general question, because I'm interested in the government's response? Is Hussein, which I think is our leading case about the duties of the... Maybe there's others, but Hussein says it rather clearly, as Agamemnon does. Are they inconsistent with Quintero? Has the Fourth Circuit gone farther than we have about what the IJ's duties are? Um, well, the Fourth Circuit, you know, in some of the language is, again, very important here. I do think the Fourth Circuit went further, but I also... Some of the language... I know you argue that this is okay even under the Fourth Circuit standard. I'm just trying to figure out from the government's view, are we more narrow in this view than the Fourth Circuit? I don't think this Court has gone quite as broad as Quintero, but I also think the argument that's presented in this case is even broader than Quintero, because the Fourth Circuit and Quintero made very clear on 630 that, yes, when a pro se individual seeks asylum or withholding of removal based on a particular social group, the IJ does have a duty to develop the record as the factual basis for the claim, help the individual articulate a cognizable social group supported by those facts, but only to the extent that one can be found. And the Court repeats this on 634, that the IJs must seek clarification as needed, help the applicant identify, delineate any potentially cognizable social group supported by his or her I do think Quintero is broader, and I do think the argument presented in this case would require this Court to go even broader than Quintero. Thank you very much. So we have rebuttal now by Mr. Kotek. Is that the correct? Your Honors, I'm going to start with the particular social group point. There's really two main issues here that we need to delineate, and that I think the immigration judge and the respondent are both kind of confusing here. First of all, we need to determine whether or not there is a cognizable particular social group, and then go to the issue of nexus. And it's actually error for this Court. This Court is actually barred from reviewing the merits of the particular social group, such as immutability, particularity, et cetera, in the first instance, because that violates SEC v Chenery. So on the issue of the particular social group itself and its existence, what we argue is that the PSG was cognizable just based on the record. Why? Why was this particular claim cognizable? Because, Your Honor, Mr. Zviosiake repeatedly testifies as to tying his unique port certification. As you know, it's what the public perceives. And in what way does the public perceive membership in his guild or union makes him part of a particular social group of this type? Your Honor, we at this Court are not in a position to Mr. Kotek, because I was a little confused by your opening there. I think that we have the same Chenery problem with respect to us addressing the merits of the PSG at all, right? We have to, if we find there is an error in not acknowledging the claim, it's for the agency to address in the first instance, right? Yes, Your Honor. Okay. Alas, the record shows that there was in fact a consideration of it, perhaps not stated, and that's the problem here. But if the record is clear that there is no PSG, it doesn't meet the standard, is it your view that we have to send this back for a futile act of having the IJ do the same thing all over again, only say more clearly why? No, that is not our opinion, Your Honor. Okay, what's your position? Our position is that because the PSG was never adequately considered, was never analyzed, was never even really thought of by the immigration judge at the hearing level, that this issue deserves remand for reconsideration of the content. See, I thought that this is useful. You're making a due process argument, are you not? This is part of the PSG argument, Your Honor. Yeah, I understand. So you're not really, let's assume for a moment it didn't happen, that the IJ had said you contended there's a port worker PSG and there's a sexual orientation PSG. And I don't find, as to the port worker PSG, that you've established the elements of a PSG on the record in this case. We'd surely be required on this record to say the IJ was right. Your contention is not that the record compels a port worker PSG, or even that the IJ was wrong in saying you haven't established a cognizable PSG. Your argument about the port worker PSG is that he didn't expressly address it, right? Your Honor, our argument is that he never realized that there was a port worker PSG. Well, whether he realized it or not, I have no idea what was in his mind. He said, I've given you all kinds of opportunities. I've looked at the whole record. Your argument is that he never expressly addressed it, right? Yes, Your Honor. Okay. So, I guess my question is, why in a case like this isn't it enough where your client clearly doesn't assert a port worker PSG? In fact, your argument on appeal is that somebody should have inferred one as opposed to that they rejected his actual assertion of one. Why isn't it enough in a case like this for an IJ to ask a bunch of questions to try to figure out what your client is doing and saying, look, I've gotten to the end of this road and I can't perceive that you've established a PSG. Does he have to discuss all the ones that you might have possibly established had you asserted them? Your Honor, under this circuit's precedent and also in the Fourth Circuit, which the Quintero case, as we mentioned, bases itself on Ninth Circuit precedent, the immigration judge has a heightened duty. No, I understand all that. I'm trying to find a case that says having done what all the things this immigration judge did, you need to tell me more, here's all the ways you might establish something, please tell me more, asking open-ended questions, is there a case that says at the end of that he must delineate all the PSGs that your client might have claimed before finding that he hasn't demonstrated the existence of one? Your Honor, we think that Aguiman and Jacinto from this circuit, as well as other circuits, clearly establish that in cases of pro se applicants, the immigration judge But again, I'm not fighting with you. I'm asking a specific question because it would be helpful to your case if you could tell me. They established general principles. I'm trying to find one where we've held, or any other court has held, that having accorded yourself in the way the before rejecting the notion that a PSG was established, by not individually discussing all the ones that might have been established had the client had the petitioner raised them. I understand, Your Honor. We claim that this directly follows from precedent in this court. Okay, then your answer is you don't have a case, but you think it follows from precedent. So I guess with Judge Smith's indulgence, I'd like to follow up with a general question and a more specific question. So to the extent that you are relying on a due process claim, is the nexus point true? Because, of course, under the regulations, if we're just looking at it as a statutory error, then maybe we have to meet our marks and keep on the line. But if there's no nexus, due process requires prejudice. And so can't we just deny on the basis that there's no nexus, even if there is a PSG, with respect to your due process claim? Well, first of all, Your Honor, it would be correct to remand on the basis that the PSG was not adequately considered. Well, I'm going to ask you, that's my second question. Can you answer my first? I'm sorry, could you repeat the question, Your Honor? So we don't have to get to nexus. If there's no nexus, we can deny on the due process claim because there's no prejudice, correct? But I'm happy to speak on there actually being no nexus in this case, Your Honor. Okay, and then on the second point, I just wanted to read what I think is your friend's best line from the IJ decision. At the end, in summing up, the IJ does say, the court finds that the harm the Respondent faced while working, and this is at 82, the harm the Respondent faced while working in his profession in Peru, port worker, certification, does not amount to Does that seem to hit the nail on the head with respect to that claim? At least, it might be the bare minimum. But doesn't the IJ say it? No, Your Honor, because throughout the portion of the opinion discussing the particular social group, the immigration judge conflates the two separate points of was there a PSG and then was there a nexus? And in denying the particular social group portion, he continually goes back to this notion of general or And we contend that the record indicates there was nothing general or random about this because under Singh v. INS, if it's appreciably different, if the harm the applicant faced is appreciably different from dangers faced by their fellow citizens, well then it's no longer general violence. And how could it be general violence in this case if he was specifically and repeatedly targeted for a certification that only he held in this area? That's simply not violence that other members of his community would have faced. We've got to go well over your time. Let me ask my colleagues whether either has additional. Thank you very much. Thank you also for the supervising attorney. We appreciate always hearing from fine law students. We appreciate your help. And we want you to know that whatever we decide, you did a good job. So thank you very much.
judges: SMITH, HURWITZ, JOHNSTONE